# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATURAL RESOURCES
DEFENSE COUNCIL, INC.
40 West 20th Street
New York, NY 10011;

NATIONAL WILDLIFE FEDERATION
11100 Wildlife Center Drive
Reston, VA 20190;

ONE HUNDRED MILES
1312 Newcastle Street, 2nd Floor
Brunswick, GA 31520; and

SOUTH CAROLINA COASTAL
CONSERVATION LEAGUE
328 East Bay Street
Charleston, SC 29401,

     Plaintiffs,

v.

ENVIRONMENTAL
PROTECTION AGENCY
1200 Pennsylvania Avenue, NW
Washington, DC 20460;

GINA MCCARTHY, in her official
capacity as the Administrator of the
Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue, NW
Washington, DC 20460;

ARMY CORPS OF ENGINEERS
441 G Street, NW
Washington, DC 20314-1000; and

JO-ELLEN DARCY, in her official
capacity as the Assistant Secretary

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Case No. 15-cv-1324

of the Army (Civil Works)
108 Army Pentagon
Washington, DC 20310-0108,

    Defendants.

## INTRODUCTION

1.      For decades, the Clean Water Act has been vital to restoring and protecting our Nation's waters from pollution. In recent years, however, legal uncertainty stemming from two Supreme Court decisions, and from informal agency policies adopted in their wake, has confused the question of what kinds of water bodies the Act protects.

2.      As a result of the confusion, critical water bodies throughout the country—especially small streams and wetlands—have been left vulnerable to pollution and other harms.

3.      Partly in response to advocacy by Plaintiffs and other citizens, Defendants the Environmental Protection Agency (EPA) and the Army Corps of Engineers (the Corps) instituted a rulemaking and issued a Final Rule, the Clean Water Rule, that clarifies what kinds of water bodies the Act protects. The Final Rule restores protections to many important waters, including water sources that affect the drinking-water supplies for millions of Americans.

4.      Although the Final Rule is generally well supported both legally and scientifically, it departs from the law and the science in three narrow but significant ways, by inadequately protecting or excluding certain waters that otherwise meet the

legal and scientific standards that the Agencies have identified as prerequisites for protection. These departures violate the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C). Additionally, the Agencies violated the notice-and-comment requirement of the Administrative Procedure Act, 5 U.S.C. §§ 553(b), (c), and 706(2)(D), by denying Plaintiffs the opportunity to comment, or refusing to consider Plaintiffs' comments, on two of these departures.

5.     To remedy these violations of law, Plaintiffs seek (1) a declaration that Defendants are violating federal law in the respects set forth herein, and (2) an order vacating and remanding only the defective portions of the Final Rule, to the extent that they are severable, or, to the extent that they are not severable, an order remanding the Final Rule without vacatur, for the Agencies to bring the defective portions into compliance with the Clean Water Act and the Administrative Procedure Act, on a schedule to be set by the Court. Because the majority of the Final Rule restores protections to important waters that would otherwise be vulnerable, Plaintiffs do not ask this Court to vacate the Final Rule in its entirety. Rather, Plaintiffs specifically request that the Court allow any and all portions of the Final Rule that are not defective as described herein, and any portions that are defective but cannot be severed from the Final Rule, to take effect and remain in effect during remand.

## JURISDICTION AND VENUE

6.     The question whether jurisdiction over challenges to the Final Rule properly lies in the Court of Appeals, pursuant to 33 U.S.C. § 1369(b)(1), or in the

District Court, is the subject of some dispute. Plaintiffs Natural Resources Defense

Council (NRDC) and National Wildlife Federation (NWF) have filed petitions for

review of the Final Rule in the Courts of Appeals; those petitions, along with several

others, have been consolidated in the Sixth Circuit. *See NRDC v. EPA*, No. 15-3820 (6th

Cir.); *NWF v. EPA*, No. 15-3817 (6th Cir.).

7.      If jurisdiction is not proper in the Court of Appeals pursuant to 33 U.S.C.

§ 1369(b)(1), then this Court has jurisdiction over the claims set forth in this Complaint

pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction) and 5 U.S.C. § 702

(Administrative Procedure Act). The relief sought is authorized by 28 U.S.C. § 2201(a)

(Declaratory Relief) and 28 U.S.C. § 2202 (Injunctive Relief).

8.      Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)

because this civil action is brought against agencies of the United States and officers and

employees of the United States acting in their official capacities and under the color of

legal authority, because defendants EPA and the Corps reside in this judicial district,

and because a substantial part of the events or omissions giving rise to the claims

occurred in this judicial district.

### THE PARTIES

The Plaintiffs

9.      Plaintiff NRDC is a national environmental advocacy group organized as

a New York not-for-profit membership corporation. NRDC has six U.S. offices,

including an office in Washington, DC, and almost 300,000 members nationwide.

NRDC's mission is to safeguard the Earth: its people, its plants and animals, and the

natural systems on which all life depends. NRDC staff members have worked for many years, especially in the years following 2001, to secure Clean Water Act protections for a broad range of aquatic resources, including small, seasonal, and rain-dependent streams, as well as wetlands, ponds, and other waters. In furtherance of these goals, NRDC has also worked to ensure that the administrative action that recently culminated in the Final Rule provides robust protections for these vital water resources, on which NRDC's members and many other Americans depend. NRDC's involvement included filing detailed comments on the proposed rule.

10.     Plaintiff NWF is a national not-for-profit membership organization dedicated to the protection of the environment and natural resources. Founded in 1936, NWF is the nation's largest member-supported nonprofit conservation, advocacy, and education organization. NWF has more than four million members, partners, and supporters nationwide, and has affiliate organizations in forty-six states and territories. NWF's mission is to educate, mobilize, and advocate to preserve and strengthen protection for wildlife and wild places. Among other things, this includes advocating for the protection of vital resources such as the wetlands, streams, and rivers upon which wildlife depends. As a result, NWF has a strong interest in ensuring that these waters are protected by the Clean Water Act, and has worked on behalf of its members and affiliates for the last fourteen years—including participating in the rulemaking that resulted in the Final Rule—to ensure that vulnerable waters receive the full protection of the Act, as required by law and justified by the current science.

11.     Plaintiff One Hundred Miles is a not-for-profit membership organization headquartered in Brunswick, Georgia. One Hundred Miles has approximately 180 members. Its mission is to protect, preserve, and enhance Georgia's 100-mile coast, which includes the conservation of water and wetlands in the coastal region. Among other things, One Hundred Miles works to preserve the integrity of fresh and saltwater ecosystems along the coast. One Hundred Miles has a strong interest in ensuring that these waters are protected by the Clean Water Act, and submitted comments on the proposal that resulted in the Final Rule.

12.     Plaintiff South Carolina Coastal Conservation League (the League) is a not-for-profit membership organization headquartered in Charleston, South Carolina. The League has approximately 2,675 active members. Founded in 1989, the League works to protect the natural environment of the South Carolina coastal plain and to enhance the quality of life of South Carolina communities by working with individuals, businesses, and government to ensure balanced solutions to environmental problems. Protecting wetlands and aquatic habitat in the Lowcountry of South Carolina has been an important goal of the League's since its establishment. The League has a strong interest in ensuring that these waters are protected by the Clean Water Act, and submitted comments on the proposal that resulted in the Final Rule.

13.     Plaintiffs bring this action on behalf of their members. Plaintiffs' members live near waters affected by the Final Rule and use these waters for drinking, swimming and fishing, observing wildlife, and other purposes. Plaintiffs' members are fearful that these waters, if not fully protected by the Clean Water Act, risk contamination from

6

pollution and other harms, which would pose health risks to Plaintiffs' members and lessen their use and enjoyment of the waters. Defendants' failure to comply with federal law harms Plaintiffs' members because it denies the full protection of the Act to the water resources that Plaintiffs' members rely on, leaving those resources vulnerable to pollution and other threats. Plaintiffs' injuries will be redressed by the requested relief.

The Defendants

14.     Defendant EPA is an agency of the U.S. government. EPA is responsible for implementing and enforcing many of the Clean Water Act's pollution-control programs. EPA has the authority to define "waters of the United States" for purposes of the Act. *See* 43 Op. Att'y Gen. 197 (1979). Together with the Corps, EPA issued the Final Rule that Plaintiffs challenge in this action.

15.     Defendant Gina McCarthy, EPA Administrator, is the highest-ranking official in the EPA. Administrator McCarthy signed the Final Rule that Plaintiffs challenge in this action. Plaintiffs sue Administrator McCarthy in her official capacity.

16.     Defendant Army Corps of Engineers is an agency of the U.S. government and a branch of the Department of the Army. The Corps is responsible for implementing and enforcing one of the Clean Water Act's pollution-control programs. Together with EPA, the Corps issued the Final Rule that Plaintiffs challenge in this action.

17.     Defendant Jo-Ellen Darcy, Assistant Secretary of the Army (Civil Works), supervises the Corps' Civil Works program, including its implementation of the Clean

Water Act. Secretary Darcy signed the Final Rule that Plaintiffs challenge in this action.

Plaintiffs sue Secretary Darcy in her official capacity.

## BACKGROUND

Uncertainty over the Clean Water Act's scope has left critical waters unprotected

18.     Americans rely on clean water for drinking, for swimming and fishing, as habitat for wildlife, and for countless other reasons.

19.     Since 1972, the Clean Water Act has been vital to restoring and protecting the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One of the Act's central features is that it applies a suite of pollution-control measures to "navigable waters," *see id.* § 1251 *et seq.*, which Congress defined as the "waters of the United States," *id.* § 1362(7).

20.     Between the mid-1970s and early 2000s, both the courts and the federal agencies responsible for enforcing the Act—EPA and the Corps—applied it broadly to protect many kinds of water bodies, including tributaries and wetlands. *See, e.g., United States v. Riverside Bayview Homes*, 474 U.S. 121, 123-24, 132 (1985).

21.     In 2001 and 2006, however, a pair of Supreme Court decisions injected uncertainty into the question of what kinds of waters the Act protects. Although the holding of the first case, *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), was narrow, and the second case, *Rapanos v. United States*, 547 U.S. 715 (2006), produced no majority opinion, the two cases engendered widespread confusion over the scope of the Act's coverage.

8

22.     In *SWANCC*, the Court ruled that the Agencies' "Migratory Bird Rule," an interpretation of the Act's implementing regulations under which waters used by migratory birds were protected, was not authorized by the Act when applied to "an abandoned sand and gravel pit in northern Illinois." 531 U.S. at 162, 164. The Court held that an intrastate, non-navigable, and "isolated" water body did not qualify for the Act's protections solely on the basis of its use by migratory birds. *Id.* at 171-72.

23.     In *Rapanos*, the Court considered whether the Act protected "four Michigan wetlands lying near ditches or man-made drains that eventually empty into traditional navigable waters." 547 U.S. at 729 (Scalia, J., announcing the judgment of the Court). Justice Kennedy concurred in the judgment and wrote a separate opinion. He concluded that the Act protects waters that have a "significant nexus" to traditional navigable waters. *Id.* at 759 (Kennedy, J., concurring in the judgment). Waters possess such a nexus when they, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. Appellate courts interpreting *Rapanos* have uniformly held that *at least* those waters that meet the significant-nexus standard are protected by the Act.

24.     Rather than amend their existing regulations to respond to *SWANCC* and *Rapanos* and clarify which waters were protected by the Act, EPA and the Corps initially exacerbated the confusion by implementing informal policies that went far beyond the Supreme Court cases and made it even more difficult to apply the Act's protections to certain kinds of waters. Specifically, these policies had the practical effect of denying

9

protections to so-called isolated waters and erecting procedural hurdles to protecting many non-navigable tributaries—including small and non-perennial streams—and their adjacent wetlands.

25. The legal quagmire left critical waters throughout the country vulnerable. The kinds of waters that have been at increased risk are ubiquitous: approximately 20 percent of the roughly 110 million acres of wetlands in the contiguous United States could be considered "isolated," and non-navigable tributaries make up more than half of the nation's stream miles. By one estimate, about 59 percent of the total stream miles in the contiguous United States do not flow year-round, and approximately 53 percent are "start reaches," making them unlikely to be traditionally navigable. An estimated 117 million Americans depend on drinking-water suppliers that draw at least in part from intermittent, ephemeral, or headwater streams.

26. Facing this broad threat to the nation's aquatic resources, Plaintiffs and many others urged EPA and the Corps to revise their regulations and establish clear protections for water bodies in a way that both respected the Supreme Court's decisions and remained true to Congress's original design.

The Clean Water Rule restores needed protections, with some exceptions

27. Finally, the Agencies initiated a rulemaking process to amend their regulations. As part of the rulemaking effort, EPA's Office of Research and Development prepared a draft report (the Science Report) that synthesized the published, peer-reviewed scientific literature discussing the physical, chemical, and biological connectivity between various kinds of streams, wetlands, and other waters

and water bodies downstream. In 2012, EPA obtained an external, independent peer review by scientists from federal agencies, academia, and consulting groups of an initial draft Science Report. Following that review, EPA released an updated draft for public review in September 2013.

28.     EPA and the Corps issued a Proposed Rule on April 21, 2014. *See* Definition of "Waters of the United States" under the Clean Water Act, 79 Fed. Reg. 22,188 (Apr. 21, 2014). Among other things, the Proposed Rule sought to restore guaranteed protections to important categories of waters—tributaries and adjacent waters—that generally had been protected only on a case-by-case basis, if at all, in the wake of the Supreme Court decisions.

29.     EPA's Science Advisory Board reviewed both the draft Science Report and the Proposed Rule. The Science Advisory Board is a public advisory group that provides extramural scientific advice to the agency. EPA sought nominations from the public for the panel that reviewed the draft Science Report; the panel consisted of technical experts from academia, a federal government agency, nonprofit organizations, and consulting firms.

30.     In September 2014, the Science Advisory Board sent EPA a letter opining that "the available science supports the conclusion that the types of water bodies identified as waters of the United States in the proposed rule exert strong influence on the physical, chemical, and biological integrity of downstream waters."

31.     The Agencies received over one million public comments on the proposal, including comments from Plaintiffs. Plaintiffs expressed strong support for the

Proposed Rule, but they also requested that the Agencies make the final rule more protective of the nation's waters by, for example, limiting an exclusion for waste treatment systems.

32.     After receiving input from the public and the Science Advisory Board, EPA published its final Science Report in January 2015. *See* EPA, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence* (Final Report), EPA/600/R-14/475F (2015). The Science Report presented several major conclusions, including the following:

   a.     "The scientific literature unequivocally demonstrates that streams, individually or cumulatively, exert a strong influence on the integrity of downstream waters. All tributary streams, including perennial, intermittent, and ephemeral streams, are physically, chemically, and biologically connected to downstream rivers via channels and associated alluvial deposits where water and other materials are concentrated, mixed, transformed, and transported."

   b.     "The literature clearly shows that wetlands and open waters in riparian areas and floodplains are physically, chemically, and biologically integrated with rivers via functions that improve downstream water quality, including the temporary storage and deposition of channel-forming sediment and woody debris, temporary storage of local ground water that supports baseflow in rivers, and transformation and transport of stored organic matter."

   c.     "Wetlands and open waters in non-floodplain landscape settings . . . provide numerous functions that benefit downstream water integrity.

These functions include storage of floodwater; recharge of ground water that sustains river baseflow; retention and transformation of nutrients, metals, and pesticides; export of organisms or reproductive propagules to downstream waters; and habitats needed for stream species."

d.      "The incremental effects of individual streams and wetlands are cumulative across entire watersheds and therefore must be evaluated in context with other streams and wetlands."

33.      The Agencies issued a Final Rule on June 29, 2015. *See* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015).

34.      The Final Rule recognizes eight categories of waters that are "waters of the United States" and are therefore protected by the Act's pollution-control programs.

35.      In the preamble to the Final Rule, the Agencies identify the significant-nexus standard adopted by Justice Kennedy in *Rapanos* as the "key" to the Agencies' interpretation of the Act. Accordingly, the Agencies determined that "[w]aters are 'waters of the United States' if they, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas."

36.      The first three categories of "waters of the United States" recognized in the Final Rule are traditional navigable waters, interstate waters, and the territorial seas. Under the Final Rule, these three categories of waters are guaranteed the protections of the Act in all cases, just as they are under the Agencies' existing regulations.

13

37.     The fourth category is impoundments of waters of the United States. The Agencies found that "impoundments continue to significantly affect the chemical, physical, or biological integrity of downstream traditional navigable waters, interstate waters, and the territorial seas." Impoundments are guaranteed the protections of the Act, just as they are under the Agencies' existing regulations.

38.     Like the first four categories of waters, two additional categories—tributaries and adjacent waters—are also guaranteed the protections of the Act under the Final Rule. Following *SWANCC* and *Rapanos*, the Agencies had not rigorously enforced the Act's protections with respect to many of these waters, and they had typically relied on a time- and resource-consuming case-by-case analysis to determine which waters should be protected. The Final Rule restores guaranteed protections to all tributaries and adjacent waters, as those categories are defined in the Final Rule. It does so based on the Agencies' express finding that the scientific evidence reveals that waters in these categories have a significant nexus to traditional navigable waters, interstate waters, or the territorial seas.

39.     The Final Rule defines a tributary as a "water that contributes flow, either directly or through another water" to traditional navigable waters, interstate waters, or the territorial seas, and "that is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark."

40.     The Final Rule defines "adjacent" waters as "bordering, contiguous, or neighboring" traditional navigable waters, interstate waters, the territorial seas, impoundments, or tributaries. The Rule defines "neighboring" to include (a) waters

within 100 feet of the ordinary high-water mark of traditional navigable waters, interstate waters, the territorial seas, impoundments, or tributaries; (b) waters within the 100-year floodplain, and not more than 1,500 feet from the ordinary high-water mark, of traditional navigable waters, interstate waters, the territorial seas, impoundments, or tributaries; and (c) waters within 1,500 feet of the high-tide line of traditional navigable waters, interstate waters, or the territorial seas, or within 1,500 feet of the ordinary high-water mark of the Great Lakes.

41.     Notably, the definition of "adjacent" waters does not include "[w]aters being used for established normal farming, ranching, and silviculture activities." Existing regulations explain that "[n]ormal farming, silviculture and ranching activities" include "plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices." *See* 40 C.F.R. § 232.3(c)(1)(i) & (d).

42.     Two additional categories of waters may qualify as "waters of the United States," but are *not* guaranteed the protections of the Act in all cases. Instead, these waters are entitled to protection if they are determined in a subsequent, case-by-case analysis to have a "significant nexus" to traditional navigable waters, interstate waters, or the territorial seas.

43.     The first category of waters that are eligible for case-by-case protection comprises five types of water features that the Agencies have found are "similarly situated" in their effects on the chemical, physical, and biological integrity of downstream waters. As a result of that finding, an analysis of whether one of these

15

water features meets the significant-nexus standard must consider the feature together with others of the same type of feature that are located in the same watershed. These five types of water features are: (a) prairie potholes, (b) Carolina bays and Delmarva bays, (c) pocosins, (d) Western vernal pools, and (e) Texas coastal prairie wetlands.

44.     The second category of waters that are eligible for case-by-case protection are waters that (a) are within the 100-year floodplain, but more than 1,500 feet from the ordinary high-water mark, of a traditional navigable water, interstate water, or the territorial seas, or (b) are within 4,000 feet of the high-tide line or the ordinary high-water mark of traditional navigable waters, interstate waters, the territorial seas, impoundments, or tributaries, and do not already meet the definition of "adjacent" waters as described in Paragraph 40. To qualify for protection, waters within these limits must be found to have a significant nexus to traditional navigable waters, interstate waters, or the territorial seas, either alone or in combination with other waters determined to be "similarly situated" in the watershed. Under the Final Rule, waters beyond these boundaries are not considered "waters of the United States," even if the waters meet the Agencies' significant-nexus standard and would otherwise be entitled to the Act's protection.

45.     The Final Rule also purports to exclude certain additional waters from the category of "waters of the United States." These additional exclusions include "[w]aste treatment systems, including treatment ponds or lagoons designed to meet the requirements of the Clean Water Act."

16

The Final Rule departs from law and science in limited but significant ways

46.     Although the Final Rule is generally consistent with the Clean Water Act, the Supreme Court decisions interpreting the Act, and the current science, the Rule departs unaccountably from the law and the science in three limited but important ways.

47.     First, the Final Rule excludes "[w]aters being used for established normal farming, ranching, and silviculture activities" from the definition of "adjacent" waters. Although these excluded waters may still be protected if it is determined, on a case-by-case basis, that they have a significant nexus to waters of the United States, they—unlike all other adjacent waters—are denied guaranteed protection under the Clean Water Act. The Agencies gave no indication in the Proposed Rule that they were considering excluding waters used for farming from the "adjacent" category. There is no scientific rationale for treating these waters differently from other adjacent waters.

48.     Second, the Final Rule retains an existing exclusion for waste treatment systems. As interpreted by the Agencies in recent years, this provision allows natural waters to be removed altogether from the category of "waters of the United States"—and thus denied key protections of the Clean Water Act—if they are impounded and turned into waste treatment systems. This result contravenes a fundamental premise of the Act: that our Nation's waters are not to be used as waste dumps. It likewise contradicts the Agencies' express determination that impoundments of waters of the United States have a significant nexus to traditional navigable waters, interstate waters, or the territorial seas.

49.     The Agencies refused to consider any comments, including Plaintiffs'
comments, that advocated limiting the waste-treatment-system exclusion to prevent it
from being applied to new impoundments of waters of the United States. In the
Proposed Rule, the Agencies stated their intent to make "no changes" to the waste-
treatment-system exclusion, but the text of the proposed provision contained a comma
that was not in the existing regulations. While the Agencies did not consider Plaintiffs'
comments, they explicitly considered comments expressing concern that the insertion of
the comma would change the meaning of the provision. In response to these comments,
the Agencies removed the proposed comma *and* interpreted the provision, broadening
the reach of the exclusion by implying that it applies to waste treatment systems not
designed to meet the requirements of the Clean Water Act.

50.     <u>Third,</u> the Final Rule makes ineligible for case-by-case protection waters
that are more than 4,000 feet from the high-tide line or the ordinary high-water mark of
traditional navigable waters, interstate waters, the territorial seas, impoundments, or
tributaries (and that are not within the 100-year floodplain of a traditional navigable
water, interstate water, or the territorial seas). Yet, the Agencies acknowledge that the
Corps has in the past determined that some waters beyond this boundary have a
significant nexus to traditional navigable waters. There is no scientific or legal rationale
for excluding these waters from protection under the Act's key programs, and the
exclusion contradicts the expert advice of EPA's Science Advisory Board.

## FIRST CLAIM FOR RELIEF

### (Violation of the Clean Water Act and Administrative Procedure Act)

51.     Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 50 of the Complaint.

52.     The purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

53.     EPA and the Corps have determined that "[w]aters are 'waters of the United States' if they, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas." This definition tracks Justice Kennedy's opinion in *Rapanos*, which treats as "waters of the United States" those waters which, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" 547 U.S. at 780 (Kennedy, J., concurring in the judgment).

54.     EPA and the Corps determined that "adjacent" waters—defined as waters "bordering, contiguous, or neighboring" traditional navigable waters, interstate waters, the territorial seas, impoundments, or tributaries—meet the significant-nexus standard and are therefore waters of the United States "by rule."

55.     Nonetheless, the Final Rule excludes from the "adjacent" category—and thus denies the guaranteed protection of the Clean Water Act to—"[w]aters being used for established normal farming, ranching, and silviculture activities," *even where* these

waters border, are contiguous to, or neighbor traditional navigable waters, interstate waters, the territorial seas, impoundments, or tributaries.

56.    Excluding waters that the Agencies have concluded meet the significant-nexus standard from the category of "waters of the United States" in which they belong, by virtue of their chemical, physical, and biological relationship to other waters, violates the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and is "arbitrary," "capricious," an "abuse of discretion," and "not in accordance with law" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

57.    Thus, the portion of the Final Rule that excludes "[w]aters being used for established normal farming, ranching, and silviculture activities" from the definition of "adjacent" waters violates the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and is "arbitrary," "capricious," an "abuse of discretion," and "not in accordance with law" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### (Violation of the Clean Water Act and Administrative Procedure Act)

58.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 57 of the Complaint.

59.    The Clean Water Act applies a suite of mandatory pollution-control measures to "navigable waters," *see* 33 U.S.C. § 1251 *et seq.*, which Congress defined broadly as the "waters of the United States," *id.* § 1362(7).

60.    EPA and the Corps have determined that "[w]aters are 'waters of the United States' if they, either alone or in combination with similarly situated waters in

the region, significantly affect the chemical, physical, or biological integrity of

traditional navigable waters, interstate waters, or the territorial seas."

61.    Although the Final Rule defines "waters of the United States" to mean

waters that meet the significant-nexus standard, it also purports to exclude from the

category of "waters of the United States" certain waters that the Agencies have

concluded meet this standard.

62.    <u>First,</u> the Final Rule's exclusion for waste treatment systems allows

impoundments of waters of the United States to be removed from the category of

"waters of the United States"—and thus denied key protections of the Clean Water

Act—*even though* the Agencies determined that "impoundments continue to

significantly affect the chemical, physical, or biological integrity of downstream

traditional navigable waters, interstate waters, and the territorial seas."

63.    <u>Second,</u> although the Final Rule classifies as "waters of the United States"

waters that are determined to meet the significant-nexus standard, the Final Rule

excludes from this category—and thus denies key protections of the Clean Water Act

to—waters that are more than 4,000 feet from the high-tide line or the ordinary high-

water mark of traditional navigable waters, interstate waters, the territorial seas,

impoundments, or tributaries (and that are not within the 100-year floodplain of a

traditional navigable water, interstate water, or the territorial seas), *even though* the

Agencies acknowledge that the Corps has in the past determined that certain waters

beyond this boundary meet the significant-nexus standard.

21

64.     Having determined that "waters of the United States" are those waters that meet the significant-nexus standard, the Agencies do not have authority under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, to deny the Act's protections to waters that the Agencies have concluded meet that standard.

65.     Thus, the portions of the Final Rule that exclude from the category of "waters of the United States" (1) waste treatment systems and (2) waters that are more than 4,000 feet from the high-tide line or the ordinary high-water mark of traditional navigable waters, interstate waters, the territorial seas, impoundments, or tributaries (and that are not within the 100-year floodplain of a traditional navigable water, interstate water, or the territorial seas) violate the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

## THIRD CLAIM FOR RELIEF

**(Violation of the Administrative Procedure Act's Notice-and-Comment Requirement)**

66.     Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 65 of the Complaint.

67.     The Administrative Procedure Act requires agencies to provide public notice of a proposed rulemaking, to give interested persons an opportunity to participate in the rulemaking by submitting comments, and to consider the relevant comments submitted. 5 U.S.C. § 553(b), (c). The Agencies violated the notice-and-comment requirement in two ways.

68.   <u>First,</u> the Agencies gave no indication in the Proposed Rule that they were considering excluding "[w]aters being used for established normal farming, ranching, and silviculture activities" from the definition of "adjacent" waters, and Plaintiffs could not have anticipated that the Agencies would include this exclusion in the Final Rule. Plaintiffs had no opportunity to comment on the exclusion of "[w]aters being used for established normal farming, ranching, and silviculture activities" from the definition of "adjacent" waters.

69.   This violation of the notice-and-comment requirement prejudiced Plaintiffs because, had they had an opportunity to comment on the exclusion of "[w]aters being used for established normal farming, ranching, and silviculture activities" from the definition of "adjacent" waters, they would have objected vigorously to this exclusion.

70.   <u>Second,</u> the Agencies asserted that they were making no changes to the existing provision excluding waste treatment systems from the category of "waters of the United States," and they refused to consider Plaintiffs' comments requesting that the Agencies limit the exclusion. However, the Agencies' response to other comments on the waste-treatment-system exclusion shows that the Agencies actually reconsidered the provision. By so doing, the Agencies reopened the waste-treatment-system exclusion and were therefore required to consider Plaintiffs' comments.

71.   This violation of the notice-and-comment requirement prejudiced Plaintiffs because they object strongly to the waste-treatment-system exclusion, to the interpretation of the exclusion advanced by the Agencies in recent years, and to the

23

interpretation of the exclusion expressed in the preamble to the Final Rule, yet the Plaintiffs had no opportunity to have these views considered by the Agencies during the rulemaking.

72.     Thus, the portions of the Final Rule excluding "[w]aters being used for established normal farming, ranching, and silviculture activities" from the definition of "adjacent" waters, and excluding waste treatment systems from the category of "waters of the United States," were promulgated "without observance of procedure required by law" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.     Declare that Defendants are each in violation of the Clean Water Act and Administrative Procedure Act as described above;

2.     To the extent that the defective portions of the Final Rule, as described above, can be severed from the Final Rule, vacate and remand only the defective portions of the Final Rule, for the Agencies to bring those defective portions into compliance with the Clean Water Act and the Administrative Procedure Act, on a schedule to be set by the Court;

3.     To the extent that the defective portions of the Final Rule, as described above, cannot be severed from the Final Rule, remand the Final Rule without vacatur, for the Agencies to bring the defective portions of the Final Rule into compliance with the Clean Water Act and the Administrative Procedure Act, on a schedule to be set by the Court;

4.      Allow any and all portions of the Final Rule that are not defective as described above, and any portions that are defective but cannot be severed from the Final Rule, to take effect and remain in effect during remand;

5.      Grant Plaintiffs their costs of suit, including reasonable attorney fees; and

6.      Grant Plaintiffs such further relief as is necessary and appropriate.


Dated: August 14, 2015                    Respectfully submitted,

**SOUTHERN ENVIRONMENTAL**          **NATURAL RESOURCES**
**LAW CENTER**                               **DEFENSE COUNCIL**

/s/ Catherine Wannamaker               /s/ Jon P. Devine, Jr.
Catherine Wannamaker                   Jon P. Devine, Jr.
Christopher K. DeScherer               DC Bar No. 474582
463 King Street, Suite B               Natural Resources Defense Council
Charleston, SC 29403                   1152 15th Street, NW, Suite 300
Phone: (843) 720-5270                  Washington, DC 20005
E-mail: cwannamaker@selcsc.org         Phone: (202) 289-2361
E-mail: cdescherer@selcsc.org          E-mail: jdevine@nrdc.org

Megan L. Hinkle                        Jennifer A. Sorenson
127 Peachtree Street, Suite 605        Natural Resources Defense Council
Atlanta, GA 30303-1840                 111 Sutter Street, 20th Floor
Phone: (404) 521-9900                  San Francisco, CA 94104
E-mail: mhinkle@selcga.org             Phone: (415) 875-6164
                                       E-mail: jsorenson@nrdc.org
*Counsel for Plaintiffs One Hundred*
*Miles and South Carolina Coastal*     Catherine Marlantes Rahm
*Conservation League*                  Natural Resources Defense Council
                                       40 West 20th Street
                                       New York, NY 10011
                                       Phone: (212) 727-4628
                                       E-mail: crahm@nrdc.org

                                       *Counsel for Plaintiffs Natural Resources*
                                       *Defense Council and National Wildlife*
                                       *Federation*

25